**Mitch PAULSEN, Plaintiff,**

v.

**Orin LEHMAN, In His Official Capacity As Commissioner of the New York State Office of Parks, Recreation and Historic Preservation, And the New York State Office of Parks, Recreation and Historic Preservation, Defendants.**

**No. CV 90–2942 (ADS).**

United States District Court,
E.D. New York.

Dec. 1, 1993.

Clifton Budd & Demaria, New York City (Brian J. Clark, of counsel), for plaintiff.

Robert Abrams, Atty. Gen. State of N.Y., New York City (Charles F. Sanders, Ellen J. Fried, of counsel), for defendants.

## OPINION AND ORDER

SPATT, District Judge.

Say the word "beach" to most Americans and they will conjure images of cool breezes beneath a piercing sun, swimmers diving under breaking waves, ships bobbing on the horizon line, and evening strolls along a boardwalk under an azure sky. "Beaches" have been the subject of plaintive poems, raucous records, and comedic as well as melancholic motion pictures.

So far as the defendants in this case are concerned, it is this visualization of the "beach experience" which lies at the heart of the controversy now before the Court. The plaintiff wishes to distribute his noncommercial religious literature at Jones Beach State Park, perhaps the most utilized beach area on all of Long Island. The defendants contend that the plaintiff's activities should be restricted, to allow the citizens of Long Island to "attend the beach and commune with nature and relieve the stress and concerns of day to day life," without such disruption.

The plaintiff moves for partial summary judgment on his First Amendment claims, and the Court must weigh, among other issues, the competing interests presented by both sides.

## I. FACTUAL BACKGROUND

### A. Jurisdiction and Parties

The Complaint asserts jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1343(a)(3) and (4) (civil rights), § 2201 (declaratory judgment) and 42 U.S.C. § 1983 (civil action for deprivation of rights).

The plaintiff Mitch Paulsen is the founder and principal of Mitch Paulsen Outreaches, a Christian Evangelical organization operating in the New York metropolitan area, which lists a Post Office Box in Baldwin, New York as its address.

The defendant Orin Lehman was the Commissioner of the New York State Office of Parks, Recreation and Historic Preservation, who is sued in his official capacity. The Commissioner or his designees are authorized to issue permits to the public for special events or activities in state parks.

The defendant New York State Office of Parks, Recreation and Historic Preservation ("State Office of Parks" or "SOP") is a division or department of the Executive Branch of the State of New York, having its principal place of business in Albany, New York, and a regional office at Belmont Lake State Park in Babylon, New York.

### B. History of the Litigation

This lawsuit has progressed in several stages. The Court has, in fact, rendered two prior decisions, the first in August, 1990, and the second in March, 1991 (see Paulsen v. Lehman, 745 F.Supp. 858 [E.D.N.Y.1990]; Paulsen v. Lehman, 839 F.Supp. 147 [E.D.N.Y.1991]). In light of these two previous determinations, familiarity with which is presumed, the Court will recite only those facts essential to the motion for partial summary judgment now before the Court.

The plaintiff filed a Complaint on August 21, 1990, in which he alleged that the defendants violated his right to freedom of expression, free exercise of religion, and equal protection of law, in violation of 42 U.S.C. § 1983. Simultaneous with the filing of the Complaint, the plaintiff also submitted an Order To Show Cause in which the plaintiff sought a preliminary injunction preventing the defendants from refusing to grant him a permit to use the "mosaic" area or any other area at Jones Beach State Park to distribute noncommercial pamphlets containing a religious message on the Labor Day weekend, September 1, 1990, and other holiday weekends until the determination of this action.

Following a hearing on August 24, 1990, the Court issued a Memorandum and Order granting the plaintiff's application for a preliminary injunction, to a limited extent, solely on the basis of his First Amendment claims as alleged in the first cause of action. The Court stated as follows:

"plaintiff's application to preliminarily enjoin the defendants from denying him a

permit to distribute noncommercial pamphlets which contain a religious message on September 1, 1990 at the mosaic area of Jones Beach State Park is granted only to the following extent: the defendants are directed to issue a permit to the plaintiff which allows the plaintiff and two other persons to distribute the literature set forth in his August 2, 1990 Application from 11:00 a.m. to 2:00 p.m. on September 1, 1990, at the mosaic area (as defined by the plaintiff ...) of Jones Beach State Park subject to the conditions that (a) the plaintiff obtain his park badges at 7:45 a.m. on September 1, 1990; and that (b) at 2:00 p.m. on September 1, 1990, the plaintiff clean up all of his pamphlets which have been discarded at or near the mosaic area....

At this time, the Court makes no determination as to the constitutionality of the defendants' policy not to issue any area/facility use permits on all holiday weekends or the merits of plaintiff's other causes of action" (*Paulsen v. Lehman,* 745 F.Supp. at pp. 865–66).

In their Answer, the defendants raised two affirmative defenses: (1) that they at no time acted in contravention of the plaintiff's constitutional rights; and (2) the Complaint fails to state a claim upon which relief can be granted.

Subsequently, the defendants filed a motion to dismiss the Complaint under Fed. R.Civ.P. 12(b) on the ground that the plaintiff's claims were moot. The defendants also moved to stay their obligation to respond to the request for production of certain documents pursuant to the provisions of Rule 26. In turn, the plaintiff moved to file a Supplemental Complaint pursuant to Rule 15(d) and to compel the defendants to produce the requested documents under the provisions of Rule 37.

In its March 25, 1991 Memorandum and Order, the Court denied the defendants' motion for judgment on the pleadings, finding that the Complaint alleged specific facts involving the defendants in support of all three causes of action, and therefore stated claims for which relief could be granted under 42 U.S.C. § 1983. The Court also granted the plaintiff leave to file a Supplemental Complaint, holding that (1) the new allegations concerned facts occurring subsequent to the original claim which were sufficiently related to warrant joint consideration and that (2) the defendants had not shown any cognizable prejudice based upon the Supplemental Complaint. The motions for a protective order and to compel the production of documents were referred to a United States Magistrate Judge.

The Supplemental Complaint alleged that subsequent to the Court's entry of a preliminary injunction in August, 1990, the defendants promulgated a new policy with respect to the issuance of permits. The plaintiff also alleged that on December 21, 1990, he wrote to the defendants and asked that he be permitted to continue to "peacefully distribute noncommercial, religious literature whenever and wherever Jones Beach is open to the public without the necessity of having to apply for a permit." The plaintiff characterized this process as "burdensome and unnecessary." He further alleged that the defendants did not respond to this correspondence. The new pleading also contained a "Supplemental Claim for Relief"—entitled "Freedom of Speech and Press."

## II. *PROCEDURAL SETTING*

The plaintiff moves for partial summary judgment, pursuant to Fed.R.Civ.P. 56, granting the following relief: (1) summary judgment on the First Amendment claims as asserted in the first cause of action in the original Complaint as well as in the Supplemental Complaint; (2) the issuance of a permanent injunction against the defendants enjoining them from imposing any unlawful restraints on the exercise of free speech at Jones Beach State Park; and (3) a declaratory judgment that the defendants' scheme for the licensing of speech and press activities constitutes an unconstitutional prior restraint.

During oral argument of this motion, both sides agreed that there were no material issues of fact to be resolved, but rather questions of law to be adjudicated. The defendants also stated in their responding papers that no genuine issue exists as to any materi-

al fact (Defendant's Brief in Opposition, at p. 6). The Court now turns to the issues and arguments presented by counsel for both parties.

In his Rule 3(g) statement, the plaintiff asserts that during the Summer of 1989, the practices at Jones Beach were regulated by a document entitled "Policy Regarding Area/Facility Use Permits and Park Facilities." In particular, this policy stated the following:

"1. Permits are available only when the park and facility requested is scheduled to be opened to the general public.

2. *Permits are not available* when otherwise previously reserved, *on holidays and holiday weekends,* or when other special events are scheduled in the Region which limits necessary park staffing capability.

\* \* \* \* \* \*

4. Applications must be in writing and must be postmarked or hand delivered twenty days prior to first use date and must be accompanied by a legal size, stamped, self-addressed envelope.

\* \* \* \* \* \*

7. The permittee may use only the facility or area which it has been assigned in the permit. Any question as to location extent of such facility or area must be resolved by the Park Manager" (emphasis supplied).

Subsequently, in December, 1990, a revised policy was implemented. The prior document remained substantially intact, with three exceptions: (1) rather than a complete ban of permits on weekends, the provision was changed to state that the issuance of permits on "holidays and holiday weekends" would now be "limited"; (2) a footnote was added indicating that beginning in 1992, applications for permits had to be received not less than 20 days nor more than 90 days prior to the proposed use; and (3) permittees must sign in at the Park Information Office not less than two hours before commencement of the permit activity.

Concurrent with the introduction of the "Area/Facility Use" policy, SOP produced a four-page booklet, with the front page containing the actual permit application and the subsequent pages consisting of regulations concerning use of the permit. In June, 1990, the plaintiff telephoned James Dolce, Legal Coordinator of the Long Island State Park Region, at the defendants' offices in Babylon, and requested permission on behalf of a church group to distribute non-commercial, religious literature at the "Mosaic" area in the Central Mall of Jones Beach for a limited period over the July 4, 1990 weekend. Dolce responded by letter dated June 28, 1990 that the "policy" prohibited the issuance of such a permit.

Paulsen's subsequent formal application on August 2, 1990 to George Gorman, Director of Recreation Services for the Long Island Region of the Parks Department, to distribute literature on the upcoming Labor Day weekend was also denied. At that time, this Court issued the preliminary injunction previously discussed.

Thereafter, on January 25, 1991, the plaintiff submitted an application asking that he be issued a single permit to distribute his non-commercial religious leaflets "wherever the public is permitted" and "anytime the park is open to the public" (Rule 3(g) Statement, Exhibit H). Director Gorman responded in a February 12, 1991 letter outlining his reasons why the plaintiff's request was not feasible—including his concerns about litter, the avoidance of double booking of a particular area, and the perception of some park patrons that leafletting activity is an intrusion—and adding that there was now a five date maximum per permit, rather than the previous requirement of one date per permit.

In an answer to Gorman dated March 7, 1991, the plaintiff stated the following:

"[i]n my request, you of course understand that when I said 'where ever the public is permitted', that means general public on sidewalks, boardwalks, pedestrian corridors and congregating places, etc. You must also know, that this is a common sense request. I mean, while we may wish to leaflet the concert goers on their way to the large amphitheater, we don't want to mill about inside.... Through numerous

phone calls last summer you made it quite clear that you have determined the sand part of the beach not to be 1st amendment territory. We are contending [sic] that. Therefore, even though there may be an occasion to pass out leaflets on the sand (such as the greekfest), we are willing to forego passing out leaflets on sand unless or until there is a declaration from the court that your 'policy' and permit procedures are unconstitutional" (Rule 3(g) Statement, Exhibit J).

In that same letter, the plaintiff asked how many applications to pass out leaflets at Jones Beach he could submit at one time, and how often he could submit them. Director Gorman sent 25 "Area/Facility Use Permit" applications and asked that the plaintiff submit a maximum of five (5) requests per application.

When the plaintiff received the 125 permit applications, he again wrote to Gorman on April 2, 1991, asking that he be issued a single permit to distribute literature at Jones Beach. The plaintiff made this request based upon information he had obtained through the logs of park activity that a single, year-long "Park Use" permit had been issued previously to a folk dancing group, allowing them to engage in activities in and around the Central Mall area throughout the off-season period at Jones Beach.

After further correspondence and negotiation, the plaintiff was issued monthly permits to distribute literature at Jones Beach, covering the period from June through December, 1991. Each of the permits contained attachments of "special conditions" with which the plaintiff Paulsen was expected to comply.

On August 14, 1991, a New York State Park Policeman issued a summons to Paulsen for distributing leaflets at Jones Beach without having a permit on his person. The summons cited him for the offense of "advertising" without a permit on his person in violation of 9 N.Y.C.R.R. § 376.1. Apparently, the initial permit issued to Paulsen for August, 1991 failed to include the vicinity of the Jones Beach Theatre as a permissible area for Paulsen to distribute leaflets. A revised permit including the entrance area to the theater was issued. The summons

against Paulsen was subsequently withdrawn.

Again on October 2, 1991, Paulsen wrote to Gorman requesting that he be issued a single permit allowing him to distribute literature on "any and all pedestrian corridors at Jones Beach State Park that are open to the general public including but not limited to sidewalks and boardwalks." Gorman denied the request by letter dated October 4, 1991 as "contrary to our policy for this type of activity." According to Exhibit "X" attached to the plaintiff's Rule 3(g) Statement, the folk dancing group which performed in the off-season had been issued an annual single "Park Use" permit, at least from 1986 to 1990. On September 14, 1990, the Regional Permit Office at Jones Beach sent this group a letter advising them that an error had been made in issuing them another "Park Use" permit and that they would now be required to obtain an "Area/Facility Use" permit (Plaintiff's Rule 3(g) Statement, Exhibit Y).

In addition, the plaintiff asserts that for June and July, 1991, the Parks Department issued two monthly permits to a group of Jones Beach lifeguards allowing them to circulate a petition. The June permit simply noted the location as "Jones Beach State Park." The July permit limited the location to "Central Main Walkway Near Mosaic Area and Boardwalk Around Flag Pole."

According to the plaintiff, Jones Beach is either a traditional public forum or a forum suitable for peaceful leafletting. Therefore, he concludes that

"(a) the defendants' published regulations banning unlicensed billing and oral expression violate the freedoms of speech and the press; *or*

(b) the defendants' failure to promulgate objective and narrowly drawn standards governing the issuance of permits for expressive activity at Jones Beach, thereby leaving such decisions to the unfettered discretion of lower level officials, constitutes an illegal prior restraint" (Plaintiff's Memorandum of Law, at p. 2).

Paulsen challenges the facial constitutionality of a statewide scheme subjecting the most

fundamental forms of speech and expressive activity to a licensing regulation.

With respect to Jones Beach State Park, the plaintiff states that there are a variety of permits in use, including the following:

1. *Photography Permits*—for commercial and amateur photography or filming;

2. *Park Use Permits*—covering a wide range of recreational activities such as nature studies, hiking, fishing, kite-flying, and "star gazing";

3. *Special Use Permits*—for unusual, large-scale activities such as military exercises;

4. *Group Use Permits*—for sizeable groups arriving for an outing where arrangements must be made to set aside a portion of the facility; and

5. *Area/Facility Use Permits*—required for individuals seeking to engage in "First Amendment" activities, such as leafletting or oral expression (Plaintiff's Memorandum of Law at pp. 4–5).

Of all the permits which apply to individual activities, only the "Area/Facility Use" permit has a formal policy and application procedure. This permitting scheme, the plaintiff contends, is unconstitutional as a prior restraint on First Amendment activity.

The defendants oppose the partial summary judgment motion on the grounds that the plaintiff is not entitled to relief because the time, place, and manner regulations and policy are reasonable. The defendants further urge the Court to dismiss both the original and Supplemental Complaint.

In his affidavit in opposition to the summary judgment motion, James Dolce, Legal Coordinator of the Long Island State Park Region describes the functions, powers and duties of the SOP, as follows:

"5. ... a) operates and maintains such facilities; b) provide[s] for the health, safety and welfare of the public using facilities under its jurisdictions; c) adopt[s], amend[s] or rescind[s] such rules, regulations and orders as may be necessary or convenient for the performance or exercise of the functions, powers and duties of the office ...

6. The State defendants have authority over the twelve (12) park regions to which the State is divided. New York Parks, Recreation and Historic Preservation Law ("PRHPL") §§ 1.03(4), (6); 7.01, 7.03. Each region is authorized to [a]dopt policies, rules and regulations applicable to its park region subject to the general policies formulated by the [C]ommissioner. PRHPL § 7.11(2)."

The defendants note that since April, 1991 and through 1992, the plaintiff Paulsen has been issued a monthly permit to distribute non-commercial literature at Jones Beach from 9 a.m. to sunset in the areas designated by SOP. Counsel states that these designated areas include a significant portion of the sites requested by the plaintiff for his distribution.

According to the defendants, SOP received telephone complaints from park patrons pertaining to "near physical confrontations" between them and Mr. Paulsen during his time at Jones Beach, which led to the inclusion of a special condition on his permit that his activity had to be conducted in a peaceable manner (Dolce Affidavit, ¶ 43). The defendants also state that no literature distribution is allowed in the Jones Beach parking lots because of the safety risks associated with moving vehicles and pedestrians getting in and out of their cars.

The defendants contend that the plaintiff seeks a "judicial mandate to do whatever he desires at any time and place, without restraint or the necessity of a permit, whenever Jones Beach is open to the public, under the guise of freedom of the press, speech and religion" (Defendants' Memorandum of Law, at p. 5). Asserting that the original action is now moot, the defendants maintain that the plaintiff cannot establish that he is entitled to the relief he seeks in the Supplemental Complaint.

Significantly, the defendants argue that Jones Beach is a nonpublic forum, or public property which is not by tradition or designation a forum for public communication. As a nonpublic forum, the area of Jones Beach presents no guaranteed right of access for free expression. In particular, counsel states that Jones Beach "is not a public park as are

City Hall, Washington Square, and Union Square Parks in New York City; this facility is not the village green in a city and urban environment where citizens commonly gather to create a forum to discuss and discourse upon current events" (id., at p. 12). According to the defendants, the facility is

"located in a geographical area which permits only limited regulated access to preserve the area. No individual has an unfettered right to complete access to all of Jones Beach facilities....
A significant number of Jones Beach activities require either a permit, fee, ticket or assigned position to allow participation....
Simply stated, a government facility termed as a park carries no automatic legal designation as a traditional public forum" (id., at pp. 12–13).

Should the Court find that Jones Beach is not a non-public forum, the defendants assert that it should be classified as a limited public forum. Although the defendants concede that the pedestrian walkways might be designated a public forum, they contend that areas such as the roadways, athletic fields, fishing areas, and parking lots are not suitable for the distribution of literature because of safety considerations. Likewise the defendants argue that tradition and custom make the beach area unsuitable for distribution of leaflets, as are public access areas such as the entrances to park offices, restaurants, restrooms, theater, and first aid areas.

Finally, the defendants argue that if the Court declares Jones Beach a public forum, the facility should have a mixed-use designation similar to or analogous to that recognized by the Supreme Court in *International Society for Krishna Consciousness, Inc. v. Lee,* — U.S. ——, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). In doing so, the Court could then treat certain areas within Jones Beach as a nonpublic forum in view of the use, activities, and historical perspective associated with the area.

With regard to the permit requirement, the defendants state that they have adopted 9 N.Y.C.R.R. §§ 372.1 and 376.1 under the auspices of the PRHPL § 3.09(8) to protect the public health, welfare and safety. Accordingly, these provisions do not prohibit the distribution of non-commercial literature, but rather require only that such activity be conducted with a permit. The defendants assert that the requirements for a permit are unrelated to content and are solely concerned with the supervision of access to pedestrian areas within the park. Without the permit requirement,

"... Jones Beach and the State defendants would be subject to hosting multiple demonstrations, parades, distributors of literature, and speeches simultaneously at different sites in the facility, including the beach area, theater, playing fields, and roadways, by advocate groups or individuals as a) pro-choice and pro-life (abortion issue); b) born-again Christians and atheists (religion); and c) white supremacists and minorities/religious groups (equality), without even the minimal authority to separate the respective groups to different and limited locations."

In reply, the plaintiff states that the defendants mischaracterize the plaintiff's position on the forum status of Jones Beach. Specifically, counsel notes that "[t]he uncontroverted record before this Court shows Paulsen's requests to the Parks Department have solely sought to distribute his non-commercial, religious literature *on the pedestrian thoroughfares of Jones Beach* during the time it is open to the public" (Plaintiff's Reply Brief, at p. 4) (emphasis supplied). The plaintiff therefore argues that when defining the nature of the forum at issue, courts must focus on the access actually sought by the speaker (*see Cornelius v. N.A.A.C.P. Legal Defense and Education Fund, Inc.,* 473 U.S. 788, 801, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 [1985]).

Significantly, the plaintiff notes that this action does not challenge the licensing or regulation of mass assemblies at Jones Beach. Rather, it contests solely the licensing requirements imposed upon fundamental First Amendment activity *by individuals.* The plaintiff contends that individual leafletting poses none of the public safety concerns presented by group demonstrations; and that the deposition testimony of the defendants' witnesses establishes that literature distribution at Jones Beach, by the plaintiff or anyone else, has never resulted in any untoward

incidents or posed any threat to the public safety.

### III. *THE GOVERNING LAW*

#### A. *Summary Judgment Standard*

A court may grant summary judgment "only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact," *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 [2d Cir.1990], and the movant is entitled to judgment as a matter of law (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 [1986]; *see also* Fed.R.Civ.P. 56[c] ). The Court must, however, resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion (*see Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 [2d Cir.1990]; *Liscio v. Warren,* 901 F.2d 274, 276 [2d Cir.1990]; *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 [2d Cir.1986], *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 [1987] ).

■ Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists (*Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 [2d Cir.1990] [quoting Fed.R.Civ.P. 56(e) ]; *see National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 203 [2d Cir.1989] ). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party" (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 [1986]; *see Converse v. General Motors Corp.,* 893 F.2d 513, 514 [2d Cir. 1990] ).

■ However, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment (*see Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 [2d Cir.1990] ). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable (*see Rattner v. Netburn,* 930 F.2d 204 [2d Cir.1991] ). Finally, the Court is charged with the function of "issue find-ing", not "issue resolution" (*Eye Assocs., P.C. v. Incomrx Sys. Ltd. Partnership,* 912 F.2d 23, 27 [2d Cir.1990] ).

#### B. *Declaratory Judgment*

The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, provides, in pertinent part, as follows:

> "[i]n a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration ..." (28 U.S.C. § 2201).

■ Significantly, the Act itself merely creates a *remedy* of declaratory relief, and does not create or confer federal subject matter jurisdiction over an action that would not normally come within the Court's original jurisdiction. That is, there must be an independent basis of federal jurisdiction before the Court may render a declaratory judgment (*see generally* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2766 [1983 & Supp.1991] [discussing operation of the Act and independent jurisdictional requirement] ).

■ "Consideration of the issue of jurisdiction is not equivalent ... to an evaluation of the merits of a party's federal claim" (*Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 99 [2d Cir.1990]; *see also Spencer v. Casavilla,* 903 F.2d 171, 173 [2d Cir. 1990] ). The test is whether the claim "is so patently without merit" so as to justify dismissal based on jurisdictional grounds (*Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 70–71, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 [1978] [citing cases] ). With regard to the claims set forth in this action, federal jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983.

■ Before proceeding to the merits of the instant motion, however, the Court must also be satisfied that there is truly a "substantial controversy" to justify relief under the Declaratory Judgment Act in light of the mandate against the issuance of advisory

opinions. Such a determination may only be properly made on a case-by-case basis (*see Salomon Bros. v. Carey,* 556 F.Supp. 499, 501 [S.D.N.Y.1983]).

■ "Congress established the declaratory judgment procedure so that parties who were uncertain of their rights could adjudicate their claims without first engaging in dubious conduct" (*Penguin Books USA Inc. v. Walsh,* 929 F.2d 69, 72 [2d Cir.1991]). The federal court's "ability to pass on the future rights and relations of parties, however, is not without significant constitutional and statutory limits. A federal court lacks the power to render advisory opinions and the authority 'to decide questions that cannot affect the rights of litigants in the case before them'" (*id.* quoting *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 [1971]). The decision to grant declaratory relief rests in the sound discretion of the district court (*see Christopher P. v. Marcus,* 915 F.2d 794, 802 [2d Cir.1990], *cert. denied,* 498 U.S. 1123, 111 S.Ct. 1081, 112 L.Ed.2d 1186 [1991]), and the question in each case " 'is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment' " (*Kidder, Peabody & Co. v. Maxus Energy Corp.,* 925 F.2d 556, 562 [2d Cir.], *cert. denied,* —— U.S. ——, 111 S.Ct. 2829, 115 L.Ed.2d 998 [1991], *quoting Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 [1969] [other citations omitted]).

## IV. DISCUSSION

■ Before turning to the merits of the issues raised here, the Court must address the defendants' contention that this case is moot. According to the defendants, the plaintiff's original claim is no longer viable by virtue of the December, 1990 policy revision which stated that there would be limited issuance of permits on holidays and holiday weekends. However, the Court finds that the "new" regulations still subject the distribution of noncommercial literature to a permitting procedure. As the Eleventh Circuit recently observed,

" ... a superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law. To the extent that those features remain in place, and changes in the law have not so fundamentally altered the statutory framework as to render the original controversy a mere abstraction, the case is not moot. Applied to this case, the amended regulations did not moot the [plaintiff's] facial challenge to the permitting scheme ... the challenged aspects of that scheme remain essentially as they were before the amendments. The scheme still involves the regulation of speech and conduct, and it still operates in the same allegedly unconstitutional fashion" (*Naturist Soc., Inc. v. Fillyaw,* 958 F.2d 1515, 1520 [11th Cir. 1992]).

In this case, the objectionable features of the prior law have been left substantially undisturbed. The revised regulations have not eliminated the harm of which the plaintiff complained. Therefore, the Court finds that the instant controversy is not moot.

### A. The Forum Question

"There is no doubt that as a general matter, peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment" (*United States v. Grace,* 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 [1983]; *see Carey v. Brown,* 447 U.S. 455, 460, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 [1980]; *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 [1940]; *Schneider v. State,* 308 U.S. 147, 162, 60 S.Ct. 146, 151, 84 L.Ed. 155 [1939]; *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 [1938]). In the August 29, 1990 Memorandum Decision, this Court stated that on the limited record of the preliminary injunction hearing, it did not have sufficient information to determine whether Jones Beach State Park is a "public forum." Based upon subsequent proceedings, the extensive motion papers submitted by both sides, and the information presented during oral argument, this Court must now make that determination.

"The forum-based approach for First Amendment analysis subjects to the highest

scrutiny the regulation of speech on government property traditionally available for public expression" (*Loper v. New York City Police Dept.*, 999 F.2d 699 [2d Cir.1993], citing *International Society for Krishna Consciousness, Inc. v. Lee*, — U.S. —, 112 S.Ct. 2701, 120 L.Ed.2d 541 [1992], *aff'g in part*, 925 F.2d 576 [2d Cir.1991]). Such property includes streets and parks which have "immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions" (*Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 [1939]).

The seminal case discussing First Amendment forum analysis is *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983), which this Court discussed at length in its prior decision (*see* 745 F.Supp. at 861–62). The Court also notes that both the United States Supreme Court and the Second Circuit have had many opportunities to distinguish the traditional public forum from a limited or designated public forum and a non-public forum (*see, e.g., International Society for Krishna Consciousness, Inc. v. Lee*, — U.S. —, 112 S.Ct. 2701, 120 L.Ed.2d 541 [1992] [airline terminal is non-public forum and regulation prohibiting solicitation of funds was subject only to a reasonableness review]; *Frisby v. Schultz*, 487 U.S. 474, 481, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 [1988] [residential street is a public forum]; *Boos v. Barry*, 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 [1988] [sidewalks are traditional public forum and those surrounding the Soviet and Nicaraguan embassies are indistinguishable from other public sidewalks]; *United States v. Grace*, 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 [1983] [public sidewalks forming perimeter of the Supreme Court grounds are public forums for First Amendment purposes]; *Loper v. New York City Police Dept.*, 999 F.2d 699, 705–06 [2d Cir.1993] [sidewalks of New York City fall into category of public property traditionally held open for expressive activity and therefore statute prohibiting loitering in public places for purpose of begging is unconstitutional]; *Paulsen v. County of Nassau*, 925 F.2d 65 [2d Cir.1991] [municipal stadium is a public forum by government designation and therefore distribution of leaflets could be restricted only as to content-neutral time, place, and manner regulations]; *Young v. New York City Transit Authority*, 903 F.2d 146 [2d Cir.], *cert. denied*, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 [1990] [subway is at best a limited forum, not an open forum for public communication either by tradition or designation]).

 Despite government ownership, it is the nature of the forum that must be examined "in order to determine the extent to which expressive activity may be regulated" (*Loper v. New York City Police Dept., supra*, 999 F.2d at 703). Therefore, the Court must look first to the physical composition of Jones Beach State Park to determine the "nature of the forum" at that location. One of the initial difficulties in assessing the forum status is reflected in the name "Jones Beach State Park" itself. The geographic area at issue is not solely a beach, nor solely a park. It is a hybrid of both, and a conglomeration of other attractions within its borders. Its mass touches three bodies of water; namely, the Atlantic Ocean, Zach's Bay and the State Boat Channel.

 The physical make-up of Jones Beach State Park is depicted in the deposition testimony of John Norbeck, Director of Operations of Jones Beach for the Parks Department, as well as in the affidavit of James Dolce, Legal Coordinator of the Long Island State Park Region. The Dolce affidavit encompasses the information given in the Norbeck deposition and sets forth the following description:

"9. Jones Beach State Park ('Jones Beach') encompasses 2,413 acres on the South Shore of Nassau County located approximately five miles from the mainland.

10. By utilizing either private or public transportation, Jones Beach patrons have access to the park by way of three causeway bridges and major parkways, Ocean, Meadowbrook and Wantagh Parkways.

11. During the peak season, a fee is required for each private vehicle entering Jones Beach during operating hours and

users of public transportation must pay the designated fare.

\* \* \* \* \* \*

14. Jones Beach consists of various fields or zones, some are oceanfront and others are bay water facilities, and eight main areas.

15. Jones Beach has six and a half (6½) miles of beach front.

16. Jones Beach provides many various activities in which a patron may chose [sic] to participate including a) bicycling; b) boating; c) fishing (by regulation on notice); d) a fitness course; e) golf; f) picnicking; g) natural and wildlife areas (by permit); h) swimming; i) surfing; j) softball (by permit); and k) walking along the boardwalk.

17. There are also several areas where one may engage in games such as: a) basketball; b) miniature golf; c) paddle tennis and d) shuffleboard.

18. At night there is a variety of dancing available in the bandshell and performances at the Jones Beach State Theater.

19. The Central Mall Area, the primary area where literature distribution is allowed by the State defendants, has the following features: a) the most densely populated area of Jones Beach, adjoining the continuous boardwalk which extends the length of six main areas of the ocean front at Jones Beach; b) two parking fields with a capacity for 9000 vehicles; c) the primary pedestrian route for all individuals arriving by bus; d) largest refreshment concession area at Jones Beach; and e) the primary first aid station and primary helicopter landing pad at Jones Beach...."

The Court also takes note of the maps of Jones Beach State Park supplied by both parties. In reviewing what appears to be the typical map distributed to the public, the Court observes the following terms: "picnic area" (multiple); "parking field" (multiple); "softball east" and "softball west"; "ice cream parlor"; "central mall"; "band shell"; "west bathhouse" and "east bathhouse"; "water tower"; "fishing station"; "fishing piers"; "miniature golf"; "roller skating rink"; "pitch putt golf"; "basketball courts"; "bike path"; "boardwalk restaurant"; "play area"; "Jones Beach Theatre"; "bathing area"; and "bicycle rack" (see Clark Affidavit, Exhibit D; Rule 3(g) Statement, Exhibit 7). In perusing a supplementary map provided by the defendants, the Court notes the additional terms "pedestrian tunnel," "rest rooms," "heliport," "souvenir shop," "first aid," and "concession delivery" (Dolce Affidavit, Exhibit 1).

"The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place and manner that are reasonable' " (Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 [1971], quoting Wright, "The Constitution on the Campus," 22 VAND.L.REV. 1027, 1042 [1969] ). What then is the "nature" or "pattern of normal activities" of Jones Beach State Park? The defendants answer this question in a variety of ways. For example, the Legal Coordinator of the Long Island Region states that Jones Beach "is devoted to the leisure time and recreational activities of our citizens, averaging approximately 432,550 patrons per week in the peak season.... there is the ability to attend the beach and commune with nature and relieve the stress and concerns of day to day life" (Dolce Affidavit, ¶¶ 20, 21).

Counsel for the defendants further asserts that

"[t]here is no long and grand 'tradition' or 'government fiat' which devotes Jones Beach 'to assembly and debate.... Jones Beach is not a public park as are [parks] in New York City; this facility is not the village green in a city ... Jones Beach is not directly located within a commercial or residential area....

Jones Beach is a recreational facility clearly evident by all the designated facility areas ... A significant number of Jones Beach activities require either a permit, fee, ticket, or assigned position to allow participation.... Simply stated, a government facility termed as a park carries no automatic legal designation as a traditional public forum" (Defendants' Memorandum of Law, at 12–13).

Significantly, this Court has been unable to find any case in the United States Supreme

Court jurisprudence or in the Second Circuit defining the nature of the forum at issue in this case—specifically, a state park combining an extensive beach area with a variety of recreational areas, pedestrian walkways and concession stands. In fact, we have pinpointed only one case in the federal system discussing the forum status of a combined beach and state park setting, namely, *Naturist Society, Inc. v. Fillyaw,* 736 F.Supp. 1103 (S.D.Fla.1990), referred to by the Court in its August 29, 1990 decision. However, since that time, the Eleventh Circuit heard the appeal in *Fillyaw,* and affirmed in part, reversed in part, and remanded the case back to the District Court.

Because of the striking similarities in physical composition of the forum in *Fillyaw,* the Court draws guidance from the analysis utilized by the Eleventh Circuit (*see Naturist Society, Inc. v. Fillyaw,* 958 F.2d 1515 [11th Cir.1992]). In *Fillyaw,* a group advocating a "clothing optional" lifestyle, sought permission to distribute literature and circulate petitions at John D. MacArthur Beach State Park in Palm Beach County, Florida (736 F.Supp. at 1106). The park manager issued a permit allowing the Society to distribute printed literature within the park, but restricted the distribution to three hours and confined it to a small table 100 yards north of the beach entrance. The group complied with this and numerous other restrictions, but subsequently filed a complaint in the Federal District Court, alleging violations of the First, Ninth, and Fourteenth Amendments to the United States Constitution under the Section 1983 rubric, seeking declaratory relief and damages.

The Society also challenged the constitutionality of certain portions of the Florida Administrative Code Rules pertaining to, among other things, the issuance of permits for distributing printed matter in Florida state parks. The District Court granted the defendants' motion for summary judgment and denied the Society's motion for summary judgment, finding that the park was a "nonpublic" forum and upholding the permitting scheme as a reasonable regulation of time, place and manner restrictions on speech and expressive conduct (*id.* at 1110–12).

On appeal, the Eleventh Circuit stated that "[t]he law compels the conclusion that John D. MacArthur Beach State Park is a public forum" and continued with the following pivotal language:

"[t]he district court believed it was 'stat[ing] the obvious' when it remarked that the park is a 'beach.' But, as the diagram appended to the court's opinion reveals, the park is *more than a beach. . . .* In particular, it contains parking lots, a nature center, and walkways. Speech and expressive conduct in these areas may not pose the same evils as on the beach. In declaring the park a non-public forum based solely upon its beach characteristics, the district court ignored other areas of the park which are not beach.

Moreover, the facts the district court recites do not render the park a non-public forum. City parks are quintessential public forums. *Perry,* 460 U.S. at 45, 103 S.Ct. at 954. In these parks, as at the beach, the public may swim, play games, rest, and enjoy the surroundings. Although the district court remarked on the small size of John D. MacArthur Beach State Park, most city parks are even smaller, presenting the same space problems the district court contemplated. As at the beach, people sunbathe in city parks, sometimes in less than the usual amount of clothing, and they often arrange their possessions around themselves, making it difficult to move when someone approaches them. As at John D. MacArthur Beach State Park, many city parks suffer a shortage of law enforcement personnel. In short, *none of the facts the district court found adequately distinguish John D. MacArthur Beach State Park from a typical city park for First Amendment purposes*" (*Naturist Soc., Inc. v. Fillyaw,* 958 F.2d 1515 [11th Cir.1992]) (emphasis supplied).

The Court finds this reasoning not only germane, but compelling.

Likewise the Court finds helpful the reasoning provided recently by the Ninth Circuit in *Gerritsen v. City of Los Angeles,* 994 F.2d 570, 576 (9th Cir.1993), a case in which the defendant contended that certain "blue-

line" areas in Los Angeles' El Pueblo Park were distinct from the rest of the park for First Amendment purposes. The Ninth Circuit found this argument unconvincing, noting that although the historic section of the park might have a "special ambience," it was indistinguishable from other sections of the park "in terms of visitors' expectations of its public forum status" (*id.*). The court held that the blue-line areas, including walkways and sidewalks, constituted a public forum.

Based upon the Court's analysis of the composition of Jones Beach State Park, as well as the *Fillyaw* and *Gerritsen* decisions, and in light of the cases previously cited which have analyzed the forum issue in both the Supreme Court and the Second Circuit, the Court finds that Jones Beach State Park is a public forum for First Amendment purposes. Having made that determination, the Court relies on the following portion of the forum analysis described in *Perry:*

> "[i]n these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.... The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication" (*Perry Educ. Ass'n, supra,* 460 U.S. at 45, 103 S.Ct. at 955).

### B. *The Constitutional Challenge to the Permit Scheme*

#### (i.) *Facial Challenge to 9 N.Y.C.R.R. § 376.1*

Having determined that leafletting is a communicative activity protected by the First Amendment, and that in this case, the activity is conducted in a traditional public forum, the Court must now examine whether the regulation at issue is: (1) necessary to serve a compelling state interest and narrowly tailored to achieve that end; or (2) can be characterized as a regulation of the time, place and manner of expression that is con-

tent neutral, is narrowly tailored to serve significant government interests and leaves open alternate channels of communication (*Perry Educ. Ass'n, supra,* 460 U.S. at 45, 103 S.Ct. at 955; *see also Loper v. New York City Police Department, supra,* 999 F.2d at 704).

A plaintiff may bring a facial challenge to the constitutionality of a statute or regulation "[w]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity...." (*City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2142–43, 100 L.Ed.2d 771 [1988]; *see also Freedman v. Maryland,* 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 [1965]). As in *Lakewood,* the permitting scheme in this case has two features that permit a facial challenge: (1) an individual must apply for a permit, which may or may not be renewed by the issuer each time the applicant wishes to undertake the activity; and (2) the permit scheme is "directed narrowly and specifically at expression or conduct commonly associated with expression" (*Lakewood,* 486 U.S. at 760, 108 S.Ct. at 2145; *see also Graff v. City of Chicago,* 986 F.2d 1055 [7th Cir.1993]).

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech...." Of course, that constitutional guarantee has been made applicable to the states by the Fourteenth Amendment. As a general matter, there is no doubt that peaceful picketing and leafletting are expressive activities involving "speech" protected by the First Amendment (*see United States v. Grace,* 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 [1983]). How such speech can or cannot be regulated was discussed at length by the Supreme Court in *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1971):

> "Although a silent vigil may not unduly interfere with a public library, *Brown v. Louisiana,* 383 U.S. 131 [86 S.Ct. 719, 15 L.Ed.2d 637] [1966], making a speech in the reading room almost certainly would. *The crucial question is whether the man-*

ner of expression is basically incompatible with the normal activity of a particular place at a particular time. Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest. Access to the 'streets, sidewalks, parks, and other similar public places ... for the purpose of exercising [First Amendment rights] cannot constitutionally be denied broadly....' [Amalgamated] Food Employees [Union Local 590] v. Logan Valley Plaza, 391 U.S. [308] at 315 [88 S.Ct. 1601, 1607, 20 L.Ed.2d 603 (1968)]" (408 U.S. at 116–117, 92 S.Ct. at 2303–2304) (emphasis supplied).

■ In such public fora, the government's ability to permissibly restrict expressive conduct is very limited. Prior restraints on speech, "even in the form of restrictions rather than prohibition," are heavily disfavored and must be construed as narrowly as possible (Eastern Conn. Citizens Action Group v. Powers, 723 F.2d 1050, 1055 [2d Cir.1983], citing Nietmotko v. Maryland, 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267 [1951]).

Two years ago, the Court of Appeals for the Second Circuit had the opportunity to discuss leafletting in the context of activities protected under the First Amendment (see Paulsen v. County of Nassau, 925 F.2d 65 [2d Cir.1991]). The Court finds guidance in the following eloquent passage of Judge Irving Kaufman discussing the distribution of handbills:

"[f]rom the time of the founding of our nation, the distribution of written material has been an essential weapon in the defense of liberty. Throughout the years, the leaflet has retained its vitality as an effective and inexpensive means of disseminating religious and political thought. Today, when selective access to channels of mass communication limits the expression of diverse opinion, the handbill remains important to the promise of full and free discussion of public issues. For those of moderate means, but deep conviction, freedom to circulate fliers implicates fundamental liberties (id. at 66–67).

A law is void on its face if it "does not aim specifically at evils within the allowable area of [government] control, but ... sweeps within its ambit other activities that constitute an exercise" of protected expressive rights (Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 [1940]). "A plausible challenge to a law as 'void for overbreadth' can be made only when (1) the protected activity is a significant part of the law's target, and (2) there exists no satisfactory way of severing the law's constitutional from its unconstitutional applications so as to excise the latter clearly in a single step from the law's reach" (Laurence H. Tribe, AMERICAN CONSTITUTIONAL LAW, § 12–24, at 711 [1978]).

■ New York State regulations set forth the parameters of free speech activity on property that is under the jurisdiction of the Parks Department. Specifically, 9 N.Y.C.R.R. § 376.1 provides in pertinent part as follows:

**"Section 376.1 Activities or Uses Prohibited *Except When Undertaken Pursuant to a Permit.***

No person shall engage in any of the following activities or uses on property under the jurisdiction, custody or control of the office [of the Parks Department], except pursuant to a permit issued by the Commissioner and in accordance with the terms thereof and any other conditions contained in this section:

(a) Meetings, public exhibitions, etc. The holding of any meeting, ceremony, religious service, parade, procession, speech, lecture or any form of entertainment, performance, motion picture, contest or other such event, *the distribution or posting of handbills or advertisements in connection therewith,* or the erection of any structure, stand or platform in connection therewith (emphasis in the original).

\* \* \* \* \* \*

(h) The promotion of any *event, belief* or *philosophy* either *by means of the posting or distribution of printed or written matter or orally*" (emphasis supplied).

The plaintiff has brought a plausible challenge in this case because (1) the protected activity here, namely, the expression of a belief or philosophy by means of the distribution of printed matter, is a significant part of the regulation's target, and (2) there is no way to sever the regulation's constitutional from its unconstitutional applications.

In discussing the First Amendment overbreadth doctrine, the Supreme Court has repeatedly emphasized that "where a statute regulates expressive conduct, the scope of the statute does not render it unconstitutional unless its overbreadth is not only 'real, but substantial as well, judged in relation to the statute's plainly legitimate sweep'" (*Osborne v. Ohio*, 495 U.S. 103, 111, 110 S.Ct. 1691, 1697, 109 L.Ed.2d 98 [1990], quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 [1973]).

Clearly, under § 376.1, "no person" can engage in First Amendment activity in the parks of New York State, including the promotion of one's religious beliefs either orally or by the distribution of written material, without a permit. The added procedural aspects of obtaining such a permit are set forth in a four-page application to the local park's permit office—a procedure which is discussed in greater detail below. The regulation therefore raises questions such as who decides what person or group gets a permit, who does not, and under what conditions may a permit application be denied.

The SOP's difficulty in justifying § 376.1 of its code lies in the complete discretion given the Commissioner or his representative under a regulation which sets forth no standards for the issuance or revocation of a permit (*see Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 [1969]; *Cantwell v. Connecticut*, 310 U.S. 296, 305–07, 60 S.Ct. 900, 904–05, 84 L.Ed. 1213 [1940]). In addition, the Policy Statement issued for Jones Beach State Park does not contain the "standards" for obtaining a permit or having one revoked, nor does there appear on the face of § 376.1 or in the Policy Statement any provision for judicial review (*see Freedman v. Maryland*, 380 U.S. 51, 58–59, 85 S.Ct. 734, 738–39, 13 L.Ed.2d 649 [1965]).

The permitting scheme at issue here creates a classic prior restraint by giving administrators the power to foreclose speech. Although not every prior restraint is invalid, in this case the restraint lacks procedural safeguards which may lead to content-based discrimination (*see Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 [1980]; *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 [1975]). A regulation or ordinance must contain explicit limits on the decisionmaker's discretion (*Lakewood*, 486 U.S. at 769, 108 S.Ct. at 2150). In this case, as the Supreme Court noted in *Osborne v. Ohio*, "[t]he constitutional vice of so broad a provision needs no demonstration" (495 U.S. at 117, 110 S.Ct. at 1700).

The Court understands and appreciates the necessity of protecting persons and property and maintaining proper order within the Jones Beach State Park grounds, but the Court questions whether section 376.1 substantially serves these purposes. This is not to say that government does not have the right and the duty to protect the public safety. However, where First Amendment activity is concerned, these regulations must be narrowly tailored to the precise circumstances at hand and such restrictions must provide for alternative means of communication. Section 376.1 literally states that no person can engage in promoting any First Amendment activity without a permit from the Commissioner. Subdivision (h) of the regulation expressly excludes "the promotion of any event, belief or philosophy either by means of the posting or distribution of printed or written matter or orally." Taken to its extreme, this prohibition would mean that two individuals walking from the parking lot to the beach at Jones Beach State Park could not discuss their differing views of a political candidate running for office, or a referendum on the ballot, without an advance permit from the Commissioner. No one could have intended the absurd logic that such an overbroad regulation allows.

Further, the Court finds problematic the regulation's failure to distinguish individual first amendment activity from group activity. Such a broad stroke of the pen cannot with-

stand constitutional scrutiny. In light of the "substantial" overbreadth and overreach of 9 N.Y.C.R.R. § 376.1, the Court finds the regulation to be unconstitutional on its face.

■ The plaintiff also challenges the regulation as a prior restraint on First Amendment expressive activity. As the Eleventh Circuit noted in *Miami Herald Pub. Co. v. City of Hallandale*, 734 F.2d 666 (11th Cir. 1984), to qualify as narrowly tailored, a content neutral ordinance "must avoid vesting city officials with discretion to grant or deny licenses" (734 F.2d at p. 163). The court went on to note the following:

"It is settled by a long line of recent decisions of this Court that an ordinance which ... makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms" (*Miami Herald Pub. Co. v. City of Hallandale, supra*, at p. 673, *quoting Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 [1969]).

This principle applies in cases where the discretion is exercised by more than one person as well. For example, where a city commission had the right, under an ordinance, to determine whether a license applicant received a business permit or to deny him such a license, the court found that this function necessarily involved the exercise of considerable discretion (*id.*).

In the area of free expression, a licensing statute placing unbridled discretion in the hands of a government official *or agency* constitutes a prior restraint and may result in censorship (*City of Lakewood v. Plain Dealer Pub. Co., supra*, 486 U.S. 750, 108 S.Ct. 2138). In addition, "accompanying such discretion is the opportunity to discriminate against a licensee on the basis of what the licensee intends to say, which in the context of licensing newspaper distribution raises the spectre of prior restraint" (*id.*, 734 F.2d at p. 675; *International Society for*

*Krishna Consciousness v. Rochford*, 585 F.2d 263 [7th Cir.1978] ).

A permit system must "leave no factors to be assessed, judgments to be made, or discretion to be exercised by the appropriate licensing official" (*Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 [1976] ). In the context of a first amendment challenge upon the facial validity of a licensing statute, it is the very existence of official discretion that gives rise to a threat of injury sufficient to warrant injunction (*Miami Herald Pub. Co. v. City of Hallandale, supra*, 734 F.2d at p. 674). Broad comprehensive regulations, specifically local ordinances regulating the distribution of literature, have been repeatedly struck down (*see Lovell v. City of Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 [1938]; *Schneider v. State of New Jersey*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 [1939]; *Cantwell v. State of Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 [1940] ).

There is nothing in 9 N.Y.C.R.R. § 376.1 that prevents content censorship. Although the defendants maintain that no one is denied a permit based on the content of their proposed activity, their rationale belies such reasoning. As noted previously, the permit system allows government personnel to avoid having two groups hosting a demonstration in the same place at the same time—the state defendants in fact described their concern with the possibility of having a clash between pro-choice and pro-life demonstrators, or white supremacists and minorities. Certainly, in these situations, the concern of the defendants arises directly from the content of the expressive activity of these groups. The Court must ask the question which individual or group gets a permit and which does not? How is that decision made?

Significantly, there is nothing in the regulation which says anything about reasonable time, place and manner restrictions. It is apparent that the face of the regulation contains no explicit limits on the administrators' discretion. The SOP asks the Court to presume that it will not deny a permit application, or that it will do so only for reasons related to the health, safety, or welfare of citizens at the beach. This, of course, pre-

sumes that the SOP will act in good faith and adhere to certain standards which, unfortunately, are not set forth in the regulation. As the Supreme Court has noted, *"this is the very presumption that the doctrine forbidding unbridled discretion disallows"* (*City of Lakewood*, 486 U.S. at p. 770, 108 S.Ct. at p. 2150) (emphasis supplied). This Court should not presume non-binding limits into a silent regulation which grants SOP personnel unbridled censorship discretion.

Over the years, the grounds of Jones Beach State Park have been used for "milk runs" by the Easter Seals Society, professional photography sessions, baptismal and other services and literature distribution by various religious organizations, folk dancing groups, scientific and nature studies, go-cart racing, lifeguard union activities, live radio broadcasts, celestial navigation courses, salt marsh research, baton twirling competitions, local union picketing, an annual "Greekfest" and a bike tour benefit (see Clark Affidavit, Exhibit F). Obviously, many of these events are non-commercial, expressive activity. This is a major, expansive park area. The beach front alone at Jones Beach State Park is six and one-half miles long. The park area sometimes accommodates more than 100,000 people on a given summer day. In addition to the mosaic area, it contains an extensive network of sidewalks, boardwalks and other walkways. Frequent recreational activity takes place at those sites. Based upon the nature of the communicative activity which the plaintiff seeks to conduct, the Court does not believe that such activity threatens any basic governmental functions at Jones Beach State Park (*compare, United States v. Kokinda*, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 [1990] [postal service property was nonpublic fora and regulation prohibiting solicitations there was subject only to a reasonableness review] ).

The distribution of leaflets in this case is not likely to "disturb seriously the audience attending an event" in the park (*see Paulsen v. County of Nassau, supra*, 925 F.2d at 71). "Because one need not stop nor 'ponder the contents of a leaflet in order mechanically to take it out of someone's hand,' the nature of the intrusion is minimal" (*id.*, quoting *United*

*States v. Kokinda, supra*, 497 U.S. at 3123, 110 S.Ct. at 3123). Ultimately, the mood and destination of beachgoers is not likely to be interfered with by the plaintiff's distribution of leaflets on the pedestrian walkways. In addition, resting or reclining on the beach presents a convenient opportunity to read leaflets that were distributed in the walkways if one chooses to do so.

"A law subjecting the exercise of First Amendment freedoms to the prior restraint of a license" must contain "narrow, objective, and definite standards to guide the licensing authority" (*Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 [1969] ). A total ban on distributing religious leaflets on certain pedestrian walkways of Jones Beach State Park cannot be justified as a reasonable place restriction under § 376.1, and does not substantially serve the purposes of the statute of which § 376.1 is a part, namely, to provide for the maintenance of law and order on the park grounds (*see United States v. Grace, supra*, 461 U.S. at 182, 103 S.Ct. at 1709–10).

The Court notes that the defendants have presented no evidence that the plaintiff's activities in any way obstructed the sidewalks or pedestrian walkways, or access to the park or beach, or threatened injury to any person or property, or "in any way interfered with the orderly administration" of the other portions of the park (*id.*). "The state may not infringe First Amendment rights on generalized and unsupported assertions that speech would clash with other governmental interests; real and substantial conflict must be demonstrated before constitutional rights may be abridged" (*Eastern Conn. Citizens Action Group v. Powers*, 723 F.2d 1050, 1055 [2d Cir.1983]; *see Tinker v. DesMoines Independent Community School District*, 393 U.S. 503, 513–14, 89 S.Ct. 733, 740–41, 21 L.Ed.2d 731 [1969] [expressive activity must "materially and substantially disrupt" other interests if it is to be regulated] ).

The prior restraint here does not qualify as a valid time, place and manner restriction because it fails to distinguish between individual activity and group, parade-type activity. Section 376.1 applies to ordinary speech, but does not differentiate between individual

and organized activity. In light of the foregoing, the Court declares that 9 N.Y.C.R.R. § 376.1 is an unconstitutional prior restraint upon individual First Amendment expressive activity.

### (ii.) *The Permit Policy at Jones Beach State Park*

The Permit Office for the Long Island Region is located at Belmont Lake State Park. According to the defendants,

"23. Permits are issued for various activities including a) Group use of a state park (i.e. day camps); b) Park Use; c) Photography (for commercial purposes); d) Revocable (land easement rental); e) Stargazing; f) [many various] Fishing; g) Camping and h) Park Entrance (Empire Passport Permit).

24. Park Use Permits are issued for a wide variety of activities that may take place within a state park. Some of these activities are a) an area/facility use permit; b) bringing heavy equipment across the parkway to the beach; c) nature study; d) stargazing; e) placement of a newspaper vending machine; f) distribution of noncommercial literature; g) live broadcasts of radio programs; and h) alcoholic beverage permit" (Dolce Affidavit).

To obtain any of these permits from the Permit Office, the applicant must fill out an application outlining the requested activity. The defendants state that after the application is "completed, received and filed by the permit office, State Park officials review the matter to determine if the request can be accommodated, and any conditions or limitations, if necessary for the permit" (¶ 25). Permits are issued to provide all patrons "equal access to park facilities and deny a monopolization of a particular area or activity by any patron or organization" (¶ 27).

Although applications are generally granted, the defendants note that "no patron has an automatic right to a permit" (28). According to the defendants, a permit is denied on grounds that the requested facility is not available, or the activity is contrary to Park Rules and Regulations.

The December, 1990 revised "Policy Regarding Area/Facility Use Permits and Park Facilities" states that the "permittee may use only the facility or area which it has been assigned in the permit" and that any questions concerning location or extent of the permissible area are to be "resolved by the Park Manager." The papers submitted by the defendants indicate that certain areas of Jones Beach State Park are "off-limits" for all handbill distribution. The second layer of policy establishes the particular permit scheme for limited leaflet distribution in other areas of the Park.

During his deposition testimony, James Dolce, Legal Coordinator for the Long Island Region of the Parks Department, explained the various permits and how they are reviewed:

"Q. There is a distinction between area facility use permits and park use permits?

A. Yes.

Q. Can you tell me what the distinction is?

A. Park use permit generally involves an individual conducting an activity which does not interact with other park patrons, and the examples I provided earlier would be a nature study, testing of equipment, fishing, whereas an area facility use permit involves the permittee interacting with the general public (pp. 13–14).

\* \* \* \* \* \*

Q. Who makes the determination of whether a requested activity at Jones Beach is a First Amendment activity?

A. This is a difficult question to answer because sometimes the permittee may not perceive the activity as a First Amendment activity or conversely they may perceive it as a First Amendment activity.

It is a determination—to answer your question, a determination would be made in consultation with either Mr. Gorman or perhaps even counsel (pp. 14–15).

\* \* \* \* \* \*

Q. Applications for area facility use permits, can they be denied?

A. Yes.

Q. What would be the reasons for their denial?

A. If an area had been previously reserved by somebody else it could be denied. If the proposed activity was inconsistent with safe operations of the facility or posed a danger to the individual or to the general public. If the park was not open at that particular time.

Q. During the hours that the park is, assuming that the permit request was only for the hours that the park is open, would there be any grounds for denying an application for an area facility use permit to distribute religious literature throughout the park; could there be such grounds?

[COUNSEL:] Objection.

A. Yes.

Q. What would those grounds be?

A. I would have to see the—it is conceivable, yes, I have to see the application. If there was another area reserved, you know I don't know that we would put two groups in the same area....

Regardless of the type of permit request, we ask the individuals to come in and/or talk with them on the telephone if they are willing to modify their request to what we believe will be a safe operation. If they are not flexible, then the permit may be denied. If they are flexible, then it is open for discussion" (pp. 18–19).

With regard to departmental review of permit applications, Mr. Dolce stated the following:

"Q. Have there been any guidelines, written guidelines implemented to assist Park personnel in determining what is and what is not First Amendment activity?

A. *No, no guidelines. Discussion, yes, but no guidelines.*

\* \* \* \* \* \*

Q. It is Mr. Gorman that makes that determination?

A. No, it depends on the activity. He could confer with me. If it is something

unusual we may confer possibly with counsel's office, or if he confers with operations to see if they have any experience with the type of activity proposed to what it involves (pp. 39–40).

\* \* \* \* \* \*

Q. I guess on that, why is it necessary that an activity as basic as pure speech, albeit, denouncing the government, is something that the Parks Department wants somebody to obtain a permit for to do?

[COUNSEL:] Objection.

A. I will answer your question. I need a moment because I am trying to segregate philosophy from actual implementation....

If somebody wants to exercise their First Amendment rights, we don't want to deny them that opportunity. We understand that the general public may have a minor inconvenience, and we have to sit in a position where we balance the desires of one individual to conduct that activity with the other individual who wishes to enjoy the quiet enjoyment of the park. *We do this by a permit policy which defines for that individual or group of individuals the limits we believe are reasonable,* and balance their interest against the general public (pp. 54–55).

\* \* \* \* \* \*

Q. Was this five date per permit standard ever set down in writing as part of an area facility use permit rule or guideline?

A. No" (pp. 77–78) (emphasis supplied).

When similar questions were asked during the deposition of George Gorman, Director of Recreation Services, Mr. Gorman responded that he was not the only individual who reviewed these matters. In particular, when questioned about the request from the plaintiff for a general permit to distribute literature anytime Jones Beach was open and wherever the public might be, Gorman stated that he did not believe that the permit department had ever acted on the request (Clark Affidavit, Exhibit B, p. 121). He add-

ed that he probably discussed the matter with Jim Dolce and that "John Norbeck was probably consulted" (p. 124) because the decision would not have been Gorman's alone.

According to Gorman, the park manager is usually the person responsible for attaching conditions to a permit. However, when asked who the final arbitrator of these issues might be, Gorman responded that "[i]t's usually a consensus type decision with something such as this, it would be out of the our legal coordinator's office because of the pending litigation" (p. 126).

The Court observes that prior to the initiation of the "Area/Facility Use" permit, all applicants for park activities were issued "Park Use" permits. The "Area/Facility Use" permit, application and policy were developed in response to previous litigation over expressive religious activity at Jones Beach State Park (Clark Affidavit, Exhibit B, pp. 20–25). It is also uncontroverted that the multiple "special conditions" attached to the plaintiff's permits were not required of other permit applicants. By means of contrast, the Court finds interesting the distinction drawn by Dolce and Gorman that weekend radio broadcasts by stations WOR and WDRE were not First Amendment activities while the plaintiff's leafletting was.

The United States Supreme Court recently had the opportunity to review in detail the constitutional ramifications of a permit scheme in the context of First Amendment activity. In *Forsyth County v. Nationalist Movement*, —— U.S. ——, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), a rural Georgia County Board of Commissioners enacted an ordinance as a result of two large civil rights demonstrations which cost over $670,000 in police protection. When the Nationalist Movement subsequently proposed to demonstrate on the courthouse steps in opposition to the federal holiday commemorating the birth of Martin Luther King, Jr., the county imposed a $100 fee.

Instead of paying the fee and holding the rally, the Movement instituted an action in the Federal District Court for the Northern District of Georgia, seeking a temporary restraining order and permanent injunction, prohibiting Forsyth County from interfering with its plans. The court denied the TRO as well as the injunction, and although it expressed doubt about the constitutionality of the portion of the ordinance which permits fees to be based on the costs incident to maintaining public order, it nonetheless found the ordinance, as applied in that case, to be constitutional. On appeal, the Eleventh Circuit held that an ordinance which charges more than a nominal fee for using public forums for public issue speech is facially unconstitutional (*Nationalist Movement v. City of Cumming*, 913 F.2d 885, 891 [11th Cir.1990]). The Supreme Court granted certiorari to resolve a dispute between the Circuits on this issue.

The Supreme Court held that the Forsyth County ordinance which required a permit and a fee before authorizing public speaking, parades or assemblies in a traditional public forum was a prior restraint on speech (*Forsyth County v. Nationalist Movement, supra*, —— U.S. at ——, 112 S.Ct. at 2401; *see Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39 [1969]). Although the Court focused on the issue of charging a fee for a permit, the Court's discussion of permit schemes in general is instructive. In particular, Justice Blackmun observed the following:

"[a]lthough there is a 'heavy presumption' against the validity of a prior restraint, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 [83 S.Ct. 631, 639, 9 L.Ed.2d 584] (1963), the Court has recognized that government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold a *march, parade, or rally*. See *Cox v. New Hampshire*, 312 U.S. 569, 574–576 [61 S.Ct. 762, 765–66, 85 L.Ed. 1049] (1941). Such a scheme, however, must meet certain constitutional requirements. It may not delegate overly broad licensing discretion to a government official. See *Freedman v. Maryland, supra*. Further, any permit scheme controlling the time, place and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communica-

tion. See *United States v. Grace*, 461 U.S. 171, 177 [103 S.Ct. 1702, 1706, 75 L.Ed.2d 736] (1983)" (*Forsyth County*, at ——, 112 S.Ct. at 2401) (emphasis supplied).

■ A government regulation which permits arbitrary application is "inherently inconsistent with a valid time, place and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view" (*Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 649, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 [1981]). "If the permit scheme 'involves appraisal of facts, the exercise of judgment, and the formation of an opinion,' *Cantwell v. Connecticut*, 310 U.S. 296, 305, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940), by the licensing authority, 'the danger of censorship and of abridgement of our precious First Amendment freedoms is too great' to be permitted" (*Forsyth County, supra*, at ——, 112 S.Ct. at 2401, quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 [1975]). The deposition testimony set forth above amply demonstrates the broad and unbridled discretion on the part of the Park officials with regard to appraising facts, exercising judgment, and forming opinions.

As the Supreme Court noted in *Forsyth County*, when evaluating a facial challenge, a Court must look to the governmental entity's own implementation and interpretation of the ordinance or regulation (*id.* at ——, 112 S.Ct. at 2401; *see Ward v. Rock Against Racism*, 491 U.S. 781, 795–796, 109 S.Ct. 2746, 2756, 105 L.Ed.2d 661 [1989]). In this case, 9 N.Y.C.R.R. § 376.1 and the permit scheme adopted by the SOP officials at Jones Beach State Park can apply to any activity on public property—from the holding of meetings, parades, lectures or any form of entertainment, to the distribution or posting of handbills.

According to the application, a permit request must be filed at least twenty days prior to the "special use date." However, there is no indication in either the application or the policy statement that the SOP or its representatives must notify the applicant of its decision within any time frame, if at all. The only advice or directive to an applicant is found on the lower right hand portion of the first page of the application, which states as follows:

"NOTE: IF YOU DO NOT RECEIVE PERMIT 5 DAYS PRIOR USE DATE, CALL THE LONG ISLAND STATE PARK REGION PERMIT OFFICE FOR VERIFICATION. (516–669–1000 EXT. 223, 224, 225)

There is no provision in either the application or the policy statement for notifying the applicant that a permit has been denied or the reasons for the denial (*compare Paulsen v. Gotbaum*, 982 F.2d 825, 827 [2d Cir:1992] [leafletting restricted only during special events, and Parks Department must notify applicant of decision within thirty days, and, if permit is denied, must advise of the grounds for denial]).

Clearly, there are "no articulated standards" with regard to the issuance of permits either in the regulation, the policy statement, or in the SOP's established practice at Jones Beach State Park (*see Forsyth County, supra*, at ——, 112 S.Ct. at 2403). The administrator is not required to rely on any objective factors, nor must he provide any explanation for his decision. Nothing in the regulation prevents the park administrator from encouraging some views and discouraging others by the grant or denial of a permit. The First Amendment clearly prohibits the "vesting of such unbridled discretion in a government official" (*id.*). As such, the permit scheme and policy at Jones Beach State Park are unconstitutional.

■ "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" (*Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 [1976]). The prohibition on the plaintiff's leafletting and the dissemination of religious views on the pedestrian walkways of Jones Beach State Park without a permit "contravene core First Amendment values" (*Paulsen v. County of Nassau, supra*, 925 F.2d at 68, citing *United States v. Grace, supra*, 461 U.S. at 176, 103 S.Ct. at 1706). The plaintiff has therefore satisfied the requirements of irreparable harm and success on the merits (*Jackson*

*Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 [2d Cir.1979] [per curiam] ) necessary to obtain permanent injunctive relief.

### (iii.) *Attorney's Fees Under § 1988*

 The Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988, provides in pertinent part as follows:

> "In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

Plaintiffs may be considered "prevailing parties for the purpose of receiving attorney's fees 'if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit' " (*Farrar v. Hobby,* —— U.S. ——, ——, 113 S.Ct. 566, 572, 121 L.Ed.2d 494 [1992], quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 [1983] ). Clearly in this case, the plaintiff has obtained the relief he sought. Therefore, the Court finds that the plaintiff is entitled to attorney's fees as a prevailing party under Section 1988, to be determined as noted below.

### C. *Conclusions of Law*

To summarize, the Court makes the following findings:

1. Jones Beach State Park is a public forum for First Amendment purposes.

2. The regulation at issue, namely, 9 N.Y.C.R.R. § 376.1 violates the Constitution because it is a facially overbroad ordinance which subjects any oral or written expression of belief or philosophy to a broad licensing requirement. Such sweeping language does not lend itself to any narrowing construction, and fails to distinguish individual from group expressive activity.

3. The Court declares that 9 N.Y.C.R.R. § 376.1 is an unconstitutional prior restraint upon individual First Amendment expressive activity.

 4. The SOP's ban on leaflet distribution in certain areas of a public park as well as its permit scheme for leafletting in other areas of the park are not valid time, place or manner restrictions on protected speech in a public forum (*Gerritsen v. City of Los Angeles,* 994 F.2d 570 [9th Cir.1993] ).

5. The permit scheme and policy at Jones Beach State Park are unconstitutional since they vest "unbridled discretion in a government official" in contravention of First Amendment prohibitions.

6. The plaintiff is entitled to permanent injunctive relief with regard to the distribution of noncommercial religious literature within the pedestrian walkways and thoroughfares, central mall area, and boardwalk area of Jones Beach State Park. Since these are the particular areas sought by the plaintiff, the Court limits its holding to those particular areas.

7. The plaintiff is further entitled under 42 U.S.C. § 1988 to attorney's fees.

8. In light of the fact that the plaintiff has obtained all of the relief requested in his pleadings, the Court finds it unnecessary to address the remaining claim brought on the grounds of equal protection.

### V. *CONCLUSION*

Based on the foregoing, the Court grants the plaintiff's motion for partial summary judgment on the First Amendment claims as set forth in the original as well as the Supplemental Complaint. In addition, the defendants are hereby permanently enjoined, along with their agents, employees, successors, and all persons subject to their discretion and control, from imposing any unlawful prior restraint on the plaintiff's right to distribute noncommercial literature or to engage in other First Amendment activity within the pedestrian walkways and thoroughfares, central mall area, and boardwalk area of Jones Beach State Park. Since the plaintiff has obtained the relief sought in the pleadings, the Court finds it unnecessary to address his equal protection claim.

The law firm representing the plaintiff is directed to submit an affidavit of services to the Court on or before December 10, 1993. Counsel for the defendants are given until December 17, 1993 to respond to the plaintiff's affidavit. The matter of attorney's fees will be placed on the Court's motion calendar

for oral argument on January 7, 1994, at 9:30 a.m.

**SO ORDERED.**